IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
Statesville Division

| | |
|---|---|
| Paul Alexander Exon,<br><br>                     Plaintiff,<br>   v.<br><br>Town of Mooresville, North Carolina;<br>Chief Ronald Campurciani, in his official and<br>individual capacity; Assistant Chief Rhonda Faust,<br>in her individual and official capacity;<br>Captain Bucky Goodale, in his official and individual<br>capacity; and Tracey Jerome, in her individual and<br>official capacity,<br><br>                    Defendants. | CASE NO.: 5:26-cv-76 |

## **COMPLAINT AND JURY DEMAND**

## **INTRODUCTION**

1. This is a civil-rights action arising from Defendants' sustained, coordinated, and escalating retaliation against Plaintiff Paul Exon after he engaged in protected speech concerning a February 24, 2025 law-enforcement operation conducted in Iredell County.

2. At all relevant times, Plaintiff was a sworn police officer employed by the Town of Mooresville. He also served on the Town's Special Response Team ("SRT"), functioned in that capacity as a team medic, maintained separate licensure as a paramedic, and later served as a certified law-enforcement instructor.

3. Plaintiff was not a case agent, investigator, or decisionmaker with respect to the operation at issue. He had no role in obtaining the warrant, directing the investigation, or determining inter-agency coordination. He participated solely in an operational support capacity as an SRT medic.

Case 5:26-cv-00076   Document 1   Filed 03/30/26   Page 1 of 46

4. The operation was led by North Carolina Alcohol Law Enforcement ("ALE") and occurred approximately five to six miles outside the Town of Mooresville's extra-territorial jurisdiction, within Iredell County and within the primary territorial jurisdiction of the Iredell County Sheriff's Office ("ICSO").

5. The operation was never designated to Plaintiff as covert, classified, or otherwise subject to any communication restriction. No instruction prohibited discussion with ICSO personnel. No directive advised Plaintiff that ICSO—the territorial law-enforcement authority—was to be treated as an unauthorized recipient of information concerning the operation.

6. To the contrary, the operation was publicly observable before it was executed. A State Highway Patrol helicopter circled the target location, and its presence over the property was visible and disseminated in real time through publicly accessible flight-tracking platforms and social media.

7. Upon information and belief, the underlying criminal matter did not originate with the Mooresville Police Department ("MPD"), but instead arose from a Guilford County investigation involving a Greensboro Police Department officer as the complainant. Public records identify the target location as 112 Birdsong Lane, Mooresville, North Carolina—a property located outside the Town's jurisdictional limits.

8. These facts rendered MPD's participation both unusual and jurisdictionally sensitive, and they heightened the legitimate law-enforcement interest of ICSO—the agency with primary territorial authority—in understanding what had occurred within its jurisdiction.

9. After the operation was completed and the suspect was secured in custody, Plaintiff responded to a communication initiated by Iredell County Sheriff's Deputy Madison Sharpe, a sworn law-enforcement officer with full territorial and subject-matter jurisdiction over the location where the operation had just occurred.

Case 5:26-cv-00076    Document 1    Filed 03/30/26    Page 2 of 46

10. Deputy Sharpe contacted Plaintiff based on publicly observable activity and his prior familiarity with the location and subject. Plaintiff did not initiate the communication.

11. In response, Plaintiff conveyed limited, post-execution information regarding an already-completed and publicly visible operation. Plaintiff did not disclose tactical plans, confidential investigative techniques, or any information unknown to the territorial law-enforcement authority.

12. No policy prohibited such communication. No restriction of any kind had been communicated to Plaintiff before, during, or after the operation. At all relevant times, communication with ICSO personnel regarding activity occurring within their jurisdiction was routine and unregulated.

13. Plaintiff's speech did not compromise the operation. By the time the communication occurred, the warrant had been executed, the suspect was in custody, and the presence of law enforcement at the scene had already been exposed to public view.

14. Notwithstanding these facts, Defendants treated Plaintiff's speech as misconduct. They initiated an internal investigation, placed Plaintiff on administrative leave, and began constructing a disciplinary case premised on a materially false and pretextual characterization of Plaintiff's conduct.

15. Within hours of placing Plaintiff on administrative leave, Defendants reversed a supervisor-approved authorization permitting Plaintiff to engage in secondary employment as a paramedic—employment that had been previously approved and fully compliant with existing policy.

16. Defendants then issued a prohibition on that employment with less than twelve hours' notice before a scheduled EMS shift. The timing and manner of that directive made

compliance impracticable and created the very circumstances Defendants later relied upon to assert a policy violation.

17. Upon information and belief, Defendants then monitored, or caused to be monitored, body-worn camera footage of officers responding to a call for service and observed Plaintiff performing his duties as a paramedic. Defendants used that observation to manufacture an additional disciplinary charge—one that would not have existed but for Defendants' own abrupt and conflicting directives.

18. Defendants ultimately imposed discipline including suspension without pay, removal from the Traffic Enforcement Unit, and the loss of a five-percent specialty pay differential, resulting in ongoing economic harm.

19. In the course of imposing that discipline, Defendant Chief Campurciani inserted into the official disciplinary record a materially false and stigmatizing assertion that Plaintiff demonstrated consciousness of guilt by "deleting" messages. That assertion was false. The messaging platform at issue automatically deletes messages as a default function, and Plaintiff made no such admission.

20. Defendants further compounded their conduct by applying a revised secondary-employment policy retroactively to Plaintiff's actions. Plaintiff had acknowledged and operated under the prior policy, which contained no such prohibition. He had no notice of, access to, or acknowledgment of the revised policy at the time of the alleged violation.

21. The retaliation extended beyond Plaintiff's employment with MPD. After Plaintiff accepted employment with the Statesville Police Department and continued instructing Basic Law Enforcement Training ("BLET") courses at Mitchell Community College, Defendant Goodale—acting individually and, upon information and belief, in concert with other

Defendants—submitted complaints concerning Plaintiff to his employer, the college, and the North Carolina Criminal Justice Education and Training Standards Commission ("CJSD").

22. Those complaints were false, misleading, and retaliatory. They were designed to damage Plaintiff's professional reputation, interfere with his employment relationships, and subject him to certification jeopardy, including potential decertification and Giglio-related impairment.

23. Defendants further escalated their conduct by threatening Plaintiff with felony criminal prosecution for alleged departmental property he did not possess. That accusation was baseless and was deployed to intimidate Plaintiff and deter him from pursuing legal redress.

24. Plaintiff was not disciplined because he jeopardized an operation. He was disciplined because he engaged in protected speech—after the fact, to a sworn officer with jurisdiction—about an operation that had already become publicly visible and that raised legitimate jurisdictional and inter-agency concerns.

25. Upon information and belief, individuals responsible for planning, authorizing, or approving the operation were not subjected to comparable discipline. Plaintiff, by contrast, had no investigative role and functioned solely as an SRT medic. He was singled out for adverse treatment.

26. This disparate treatment lacked any rational basis and was motivated by retaliation, pretext, and an effort to shift scrutiny away from the circumstances of the operation itself and onto Plaintiff.

27. Defendants' actions violated Plaintiff's clearly established rights under the First and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, and also violated rights secured to Plaintiff under Article I of the North Carolina Constitution.

28. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer economic loss, reputational injury, impairment of his law-enforcement certification and instructional career, and ongoing professional and personal harm.

### NATURE OF THE ACTION

29. This is a civil-rights action arising from Defendants' sustained and retaliatory course of conduct against Plaintiff after he engaged in protected speech on matters of public concern. Defendants' conduct included, among other things, the initiation of a pretextual internal investigation, the imposition of discipline based on materially false and misleading characterizations of Plaintiff's conduct, the retroactive and arbitrary application of employment policies, the use of false and stigmatizing statements in official disciplinary records, and a continuing campaign of post-employment interference designed to impair Plaintiff's certification, employment, and professional reputation.

30. Plaintiff brings this action pursuant to 42 U.S.C. § 1983 to redress violations of rights secured by the First and Fourteenth Amendments to the United States Constitution, including: retaliation for protected speech; deprivation of liberty interests through the publication and maintenance of false and stigmatizing statements in connection with adverse employment action; deprivation of liberty and property interests without due process of law, including through retroactive policy enforcement and a structurally deficient appeals process; and municipal liability arising from unconstitutional customs, practices, policies, failures to train or supervise, and ratification by final policymakers.

31. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered loss of income, loss of employment opportunities, reputational harm, emotional distress, impairment of his law-enforcement certification and instructional career, and continuing professional harm. Plaintiff seeks, among other relief, back pay, front pay or equivalent

equitable relief, compensatory damages, punitive damages against the individual Defendants, expungement or correction of false and stigmatizing records, a name-clearing hearing, injunctive relief prohibiting further retaliatory conduct or reporting, and reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law.

## PARTIES

### A. Plaintiff

32. Plaintiff Paul Alexander Exon is a citizen and resident of North Carolina.

33. At all relevant times, Plaintiff was employed by the Mooresville Police Department ("MPD") as a sworn law-enforcement officer. He was assigned to the Traffic Enforcement Unit and also served as the medical officer for MPD's Special Response Team ("SRT").

34. At all relevant times, Plaintiff also maintained approved secondary employment as a licensed paramedic with Iredell County Emergency Medical Services. That employment was separate from, independent of, and not in conflict with his duties as an MPD officer, and it provided significant additional income.

35. Plaintiff also held instructor certifications through the North Carolina Justice Academy and the North Carolina Criminal Justice Standards Commission, qualifying him to provide law-enforcement instruction, including Basic Law Enforcement Training ("BLET").

36. Following his separation from MPD, Plaintiff accepted employment with the City of Statesville Police Department and continued teaching BLET courses through Mitchell Community College, until Defendants' retaliatory post-employment conduct materially disrupted and jeopardized those professional opportunities.

### B. Defendants

37. Defendant Town of Mooresville is a municipal corporation organized and existing under the laws of the State of North Carolina, with principal offices at 413 North Main Street, Mooresville, North Carolina 28115.

38. At all relevant times, the Town of Mooresville, acting through MPD and through its final policymakers and delegated officials, was responsible for the policies, practices, customs, training, supervision, discipline, and employment decisions governing Plaintiff's employment and the conduct at issue in this action.

39. The Town of Mooresville is a "person" subject to suit under 42 U.S.C. § 1983 and is liable for constitutional violations caused by its policies, customs, practices, failures to train or supervise, and ratification by final policymakers.

40. Defendant Ronald Campurciani was, at all relevant times, Chief of Police for MPD and, upon information and belief, also held a Town management role that materially affected or compressed the structure of Plaintiff's internal appeal rights. He is sued in his individual and official capacities.

41. Defendant Campurciani personally directed and participated in the disciplinary process against Plaintiff. Among other things, he issued the disciplinary determination, adopted and advanced the accusation that Plaintiff had engaged in misconduct by communicating with Deputy Sharpe, inserted into the official record a materially false and stigmatizing assertion regarding purported message deletion and consciousness of guilt, and denied Plaintiff's initial appeal.

42. Defendant Rhonda Faust was, at all relevant times, an Assistant Chief with MPD with supervisory authority over units involved in the February 24, 2025 operation and over Plaintiff's employment. She is sued in her individual and official capacities.

43. Defendant Faust personally initiated and directed the investigation into Plaintiff, participated in his questioning, authorized or caused his placement on administrative leave, and directed or caused the restriction of Plaintiff's secondary employment.

44. Upon information and belief, Defendant Faust acted with retaliatory motive and personal animus toward Plaintiff, which predated the events at issue and influenced the handling of the investigation, discipline, and subsequent actions taken against Plaintiff.

45. Defendant Bucky Goodale was, at all relevant times, an Internal Affairs captain or supervisory official with MPD. He is sued in his individual and official capacities.

46. Defendant Goodale participated directly in Plaintiff's compelled Garrity interview, in the disciplinary process, and in the events surrounding Plaintiff's secondary employment. Upon information and belief, he initially concurred in the permissibility of Plaintiff's paramedic work under then-existing policy before later participating in or facilitating the reversal of that position.

47. Following Plaintiff's separation from MPD, Defendant Goodale participated in the ongoing retaliatory campaign by making or causing to be made complaints to Plaintiff's subsequent employer, Mitchell Community College, and the North Carolina Criminal Justice Education and Training Standards Commission, thereby interfering with Plaintiff's employment, certification, and professional reputation.

48. Defendant Tracey Jerome was, at all relevant times, the Town Manager for the Town of Mooresville and the final administrative decisionmaker for Plaintiff's disciplinary appeal. She is sued in her individual and official capacities.

49. Defendant Jerome received and reviewed Plaintiff's appeal, which raised substantial factual, constitutional, and procedural issues. She nevertheless affirmed the discipline through a

conclusory written decision lacking factual findings, legal analysis, or meaningful engagement with the issues presented.

50. At all relevant times, Defendant Jerome acted as a final policymaker for the Town with respect to personnel decisions and appeals, and her actions constitute official policy attributable to the Town for purposes of municipal liability.

51. At all relevant times, each individual Defendant acted under color of state law and within the course and scope of his or her actual, apparent, delegated, or purported authority.

## JURISDICTION AND VENUE

52. This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

53. This Court has supplemental jurisdiction over Plaintiff's related state constitutional and common-law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise from the same case or controversy and the same nucleus of operative fact as Plaintiff's federal claims.

54. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Iredell County, North Carolina, within the Western District of North Carolina and within the Statesville Division.

55. Venue is further proper in this Division because the disciplinary actions, retaliatory conduct, and resulting harms underlying Plaintiff's claims were centered in and substantially connected to Iredell County and the Town of Mooresville.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Employment, Assignments, and Pre-Incident Background

56. Plaintiff served the Mooresville Police Department for approximately five years as a sworn law-enforcement officer. Before the events described herein, Plaintiff had rendered good service and had not been subjected to comparable discipline for similar conduct.

57. At all relevant times, Plaintiff was assigned to MPD's Traffic Enforcement Unit, a position that carried a five-percent specialty-pay differential. He also held advanced law-enforcement training and certifications, including accident reconstruction training through the North Carolina Justice Academy.

58. In addition to his Traffic assignment, Plaintiff served as the medical officer for MPD's Special Response Team ("SRT"). That role required paramedic licensure and was operationally distinct from his normal patrol and traffic-enforcement functions.

59. Plaintiff also maintained approved secondary employment as a licensed paramedic with Iredell County Emergency Medical Services, earning approximately $35.00 per hour. That work was separate from, independent of, and not in conflict with his duties as an MPD officer.

60. Plaintiff's secondary employment had been reviewed and approved under MPD's then-existing secondary-employment policy. That original policy was materially shorter than the later revised version and, upon information and belief, did not authorize MPD to suspend previously approved non-law-enforcement secondary employment based solely on administrative leave status.

61. Plaintiff had acknowledged and signed the original secondary-employment policy. He did not receive, review, acknowledge, or sign the revised policy later invoked against him.

62. Plaintiff also held instructor certifications through the North Carolina Justice Academy and the North Carolina Criminal Justice Standards Commission. Those credentials qualified him

to provide law-enforcement instruction, including Basic Law Enforcement Training ("BLET") and related instructional blocks.

63. Before the February 24, 2025 operation, Defendant Faust had already developed personal hostility toward Plaintiff. Upon information and belief, that hostility arose in part from an incident in 2024 in which Plaintiff used personal connections at the North Carolina Justice Academy to secure a Hazmat Instructor School placement for another MPD officer after that officer had been waitlisted. According to Plaintiff, the placement was something Defendant Faust, acting in a supervisory capacity, had been unable to obtain. When the Academy's confirmation reflected Plaintiff's successful intervention, Faust confronted and berated Plaintiff for stepping outside his lane.

64. Plaintiff also had prior friction with MPD command arising from his law-enforcement instructional work. Before the events at issue, Plaintiff failed a Mooresville-affiliated officer during a BLET-related standardized field sobriety testing course at Mitchell Community College after that officer did not satisfy state practical standards. According to Plaintiff, an NC Justice Academy observer present commended Plaintiff's academic integrity. Mooresville officials nevertheless complained to the college and suggested that Plaintiff had acted in bad faith.

65. These incidents are relevant not because they independently form the basis of Plaintiff's claims, but because they demonstrate animus and a preexisting institutional hostility toward Plaintiff that predated the events giving rise to this action.

**B. The February 24, 2025 Search-Warrant Operation**

66. On the evening of February 23, 2025, or the early morning hours of February 24, 2025, Plaintiff was notified that MPD's SRT would be conducting an early-morning operational

briefing. He was not informed in advance of the target, legal basis, or location of the operation.

67. On the morning of February 24, 2025, the operational briefing took place. Present were members of MPD's SRT, MPD detectives, members of the MPD Traffic Enforcement Unit, officers associated with the North Carolina State Highway Patrol, and representatives of ALE.

68. No MPD command staff, upon information and belief, was physically present for or participated in the briefing.

69. The target location was 112 Birdsong Lane, Mooresville, North Carolina, a property located approximately five to six miles outside the Town of Mooresville's Extra-Territorial Jurisdiction and within Iredell County. The location lay within the territorial jurisdiction of the Iredell County Sheriff's Office.

70. Upon information and belief, the underlying criminal matter was associated with Guilford County file number 25CR241151-400, in which a Greensboro Police Department officer was identified as the complainant and Daniel James Storie was identified at the Birdsong Lane address. The operation therefore did not arise from an ordinary MPD-originated Mooresville case.

71. ALE was identified as the lead investigating agency. ICSO was not present at the briefing, did not participate in the execution team, and, upon information and belief, had not been invited into the operation despite the fact that the target property was located within its territorial jurisdiction.

72. No crime had occurred within the Town of Mooresville itself that would have provided an obvious municipal jurisdictional nexus for MPD's operational role.

73. At no point during the briefing, and at no point thereafter before execution, was Plaintiff or any SRT member informed that the operation was "classified," "covert," or otherwise subject to any communication restriction. No one instructed Plaintiff that information concerning the operation could not be communicated after execution to other sworn law-enforcement personnel, including ICSO personnel.

74. During the SRT's tactical discussion, officers openly questioned how MPD had authority to operate well outside its jurisdiction without ICSO involvement. The team was told, in substance, to proceed on "good faith" that the necessary paperwork and approvals had been handled by the detectives or command personnel.

75. It was also openly discussed within the SRT that Iredell County Sheriff Darren Campbell would likely be angry when he learned that an operation had occurred within his county without his knowledge or participation. According to Plaintiff, that concern was understood within the team before the warrant was ever served.

76. Upon information and belief, MPD did not have a mutual-aid agreement with ALE in effect at the time of the operation, despite having mutual-aid arrangements with other agencies, including the North Carolina State Highway Patrol, ICSO, Statesville Police Department, and Troutman Police Department. The absence of such an agreement raises serious questions concerning the basis and structure of MPD's participation and is expected to be addressed further through discovery.

77. Upon information and belief, the operation was approved through MPD's criminal-investigations chain of command. Plaintiff is informed and believes that Detective Skylar Tuckler was involved in obtaining or leading the warrant operation for MPD; that Assistant Chief Jamie Quinn reviewed or approved the matter within CID; that Defendant Faust

exercised supervisory authority over that chain; and that Chief Campurciani held ultimate command authority.

78. Plaintiff's role was limited. He participated as an SRT medic and support officer. He did not apply for the warrant. He did not make jurisdictional determinations. He did not select the target. He did not control inter-agency coordination.

79. The warrant was executed without a tactical incident. Plaintiff personally handcuffed the suspect during the call-out phase after the suspect complied and exited the residence. Plaintiff then transferred custody to a detective and returned to his support role while the scene was secured.

80. Approximately twenty-five to thirty law-enforcement personnel from multiple agencies were present at or near the scene.

### C. The Operation Became Publicly Visible Before Plaintiff's Communication

81. While the SRT was staged and awaiting execution authority, a public social-media source known as "Firewire" published the North Carolina State Highway Patrol helicopter's flight path over the target area. That post made the general location of law-enforcement activity visible to members of the public before the warrant was executed.

82. Deputy Madison Sharpe of ICSO, a sworn law-enforcement officer with full territorial authority over the location in question, observed the public activity and sent Plaintiff a Snapchat message asking what was happening in the area.

83. Plaintiff did not engage in conversation while the operation was live. Instead, he responded that he could not talk at that time and would follow up later.

84. Approximately two hours after the suspect had been taken into custody and after the warrant had been fully executed, Plaintiff responded to Deputy Sharpe.

85. Plaintiff told Sharpe that Sharpe's boss was going to be angry. This was a direct reflection of what SRT personnel had already discussed among themselves before execution.

86. When Sharpe asked for more information, Plaintiff confirmed in substance that MPD had served a search warrant in the Birdsong Lane area of Iredell County. Sharpe then supplied the suspect's physical description, and Plaintiff confirmed that the description matched the individual who had been detained. Sharpe further indicated that he recognized the address and had previously responded there on calls for service.

87. Plaintiff did not disclose tactical plans, confidential investigative methods, undercover details, or any information unknown to the territorial law-enforcement authority.

88. At the time of this communication:

    a. the operation had concluded;

    b. the suspect was already in custody;

    c. the general location of police activity had already been publicly exposed through helicopter visibility and social-media dissemination;

    d. the communication was with a sworn ICSO deputy possessing full jurisdiction over the area;

    e. Deputy Sharpe independently knew the address and suspect from prior familiarity;

    f. no communication restriction had ever been imposed on Plaintiff; and

    g. the communication was initiated by Deputy Sharpe, not by Plaintiff.

89. Deputy Sharpe subsequently informed Sheriff Campbell about the operation and the communication. Upon information and belief, the Sheriff's anger arose from the fact that MPD and allied agencies had conducted a significant operation in his county and jurisdiction without his office's knowledge or participation, not from any tactical compromise caused by Plaintiff.

90. Upon information and belief, it was understood within law-enforcement circles that Plaintiff was being made the scapegoat for an institutional failure originating above his level of responsibility.

### D. The Internal Investigation, Garrity Interview, and Secondary-Employment Trap

91. On February 26, 2025, while Plaintiff was attending TASER-10 training, he was summoned to Defendant Faust's office. Faust questioned him informally about the Snapchat exchange. Plaintiff answered openly and truthfully.

92. Shortly thereafter, Plaintiff was directed to an administrative conference room by Defendant Goodale. Defendants Faust and Goodale then formally advised Plaintiff that he was under internal investigation.

93. Defendant Goodale administered Garrity warnings. Plaintiff cooperated fully and provided the same truthful account he had already given to Defendant Faust.

94. Plaintiff surrendered his department-issued phone and explained that the relevant conversation had occurred on his personal phone through Snapchat. He further explained that Snapchat messages automatically expire and could not be retrieved by him in the ordinary course as an end user.

95. Plaintiff was then placed on administrative leave effective immediately and escorted from the building.

96. Upon information and belief, the administrative or disciplinary interview was recorded using an Axon recording device in the room. Plaintiff observed that the device appeared to be recording. If preserved in the ordinary course, that recording should be discoverable through MPD records.

97. While Plaintiff's supervising sergeant, Jeremy Dingler, was transporting Plaintiff home, Defendant Faust called Dingler and directed that Plaintiff be told he could not work any secondary employment while on administrative leave.

98. Plaintiff, through counsel affiliated with the North Carolina Police Benevolent Association, sought clarification. Sergeant Dingler reviewed MPD's then-existing secondary-employment policy and determined that it did not prohibit Plaintiff's non-law-enforcement paramedic work. After consulting with Defendant Goodale, Dingler called Plaintiff and confirmed that Plaintiff could work his EMS shift.

99. Plaintiff relayed that authorization to counsel and relied upon it.

100. Approximately three hours later, at or around 6:15 p.m. on February 26, 2025, Dingler called Plaintiff again and stated that command staff had reversed the authorization. Plaintiff was now told that he could not work.

101. Plaintiff informed Dingler that his EMS shift was scheduled to begin in less than twelve hours and had been scheduled approximately one month in advance. Plaintiff also explained that canceling on such short notice could jeopardize his EMS employment and disrupt emergency services.

102. According to Plaintiff, Dingler responded in substance that Plaintiff needed to let his attorney know and that Plaintiff needed to do what he needed to do.

103. Acting on the advice of his NCPBA attorney and in reliance on the initial policy-based authorization, Plaintiff reported for his scheduled EMS shift on February 27, 2025.

104. During that shift, Plaintiff was dispatched to an MPD request for EMS assistance involving a canine bite. Plaintiff assessed and treated the patient and transported the patient for further medical care.

105. Upon information and belief, MPD administrative personnel were monitoring, or caused to be monitored, body-worn camera feeds of officers on scene and observed Plaintiff while he was performing his paramedic duties. Defendants thereafter used that observation as the basis for an additional disciplinary charge.

106. That additional charge would not have existed but for Defendants' own contradictory directives, reversal of the prior authorization, and abrupt attempt to bar previously approved secondary employment on less than twelve hours' notice.

### E. Retroactive Application of a Policy Created After the Fact

107. On February 28, 2025—the day after Plaintiff's EMS shift—MPD issued or implemented a new, materially expanded secondary-employment policy.

108. Upon information and belief, the revised policy expressly authorized, for the first time, the suspension of approved secondary employment while an officer was on administrative leave. The original policy Plaintiff had signed contained no such provision.

109. The original policy was comparatively short. The revised policy was materially longer and broader.

110. Plaintiff never received, reviewed, signed, or acknowledged the revised policy before MPD invoked it against him.

111. MPD uses PowerDMS, a policy-management platform that maintains version histories, acknowledgment records, and user-review data. PowerDMS records are expected to confirm that Plaintiff electronically acknowledged the original policy and did not acknowledge the revised version before MPD used it against him.

112. Defendants nevertheless applied the revised policy retroactively to discipline Plaintiff for conduct that had already occurred under the prior policy, after his supervisor had reviewed that prior policy and advised that the work was permitted.

## F. Disciplinary Proceedings and the Fabricated Inculpatory Statement

113. After approximately one month on administrative leave with little or no substantive communication, Plaintiff was notified by Defendant Goodale that a disciplinary hearing would be held.

114. The hearing was attended by Defendant Campurciani, who conducted the proceeding, as well as Defendants Faust and Goodale.

115. Defendants sustained three charges against Plaintiff:

   a. Conduct Unbecoming an Officer under General Order 300.03, based on the Sharpe communication;

   b. violation of the secondary-employment policy under General Order 200.12; and

   c. disobedience to orders.

116. The discipline imposed included a one-day unpaid suspension and removal from the Traffic Enforcement Unit, with reassignment to night patrol and the resulting loss of the five-percent specialty-pay differential.

117. During the appeal process, Defendant Campurciani included in a written decision the materially false assertion that Plaintiff had "showed guilt" by deleting Snapchat messages, thereby suggesting that Plaintiff had intentionally concealed evidence because he knew he had acted improperly.

118. Plaintiff made no such admission. Plaintiff had previously explained during his Garrity interview that Snapchat messages expire automatically by platform design and that he could not retrieve them.

119. Campurciani's false assertion was included in the official disciplinary record and later transmitted forward as part of the appeal process. It remains a stigmatizing and damaging component of the record concerning Plaintiff's employment and professional integrity.

120.     Plaintiff appealed first to Chief Campurciani, who denied the appeal.

121.     Plaintiff then attempted to pursue the next level of internal review. Upon information and belief, the Town's ordinary structure contemplated an intermediate level of review that, in practice, was unavailable or effectively unavailable to Plaintiff because of the overlapping role held by Campurciani within the Town's management structure.

122.     Plaintiff thereafter submitted an appeal to Town Manager Jerome, raising among other things: the First Amendment implications of his speech, the absence of any prior communication restriction, the retroactive policy issue, the disproportionality of the discipline, and his service record.

123.     On or about April 28, 2025, Defendant Jerome issued a one-paragraph decision affirming the discipline. Her decision contained no factual findings, no legal analysis, and no meaningful engagement with Plaintiff's constitutional or procedural arguments.

124.     Jerome's decision made the discipline final.

125.     Upon Plaintiff's separation from MPD, Defendants caused a notation to be placed on his F-5 separation record indicating that the agency had been aware of an investigation involving Plaintiff within the preceding eighteen months and characterizing the nature of the alleged misconduct. That notation required Plaintiff to submit a written explanatory letter to the North Carolina Criminal Justice Standards Division in order to move forward in his employment with Statesville Police Department.

126.     The F-5 notation constitutes an ongoing professional stigma that continues to follow Plaintiff in future law-enforcement employment and certification settings.

### G. Post-Employment Retaliation: BLET Complaint Campaign and Criminal Threat

127. After joining Statesville Police Department and resuming BLET instruction at Mitchell Community College, Plaintiff taught a first-responder block of instruction during January 12–14, 2026. The class included several Mooresville-affiliated cadets.

128. Plaintiff introduced himself, discussed his background, and taught the assigned material. According to Plaintiff, he engaged in routine and customary inter-agency banter common in law-enforcement training settings and, during the course, praised MPD for equipping patrol vehicles with AEDs.

129. Plaintiff also invited any student with concerns to approach him during or after class. No student did so.

130. At the conclusion of the instructional block, Plaintiff was informed that the class had achieved a one-hundred-percent pass rate.

131. Thereafter, Plaintiff learned that Defendant Goodale had submitted a formal written complaint dated January 22, 2026, to Statesville Police Department, Mitchell Community College, and the North Carolina Criminal Justice Education and Training Standards Commission. Upon information and belief, that matter was assigned or referenced as CJSD case number Exon-0071-7344.

132. The complaint accused Plaintiff of inappropriate or retaliatory treatment of Mooresville-affiliated cadets. Plaintiff alleges that those accusations were false and were made in retaliation for his prior protected speech and the dispute arising from the February 2025 operation.

133. Upon information and belief, the written statements supporting Goodale's complaint did not arise through spontaneous cadet complaints alone, but instead through an orchestrated process in which Mooresville-affiliated cadets were identified, contacted,

interviewed, or otherwise cultivated for the purpose of generating adverse statements against Plaintiff.

134.     This was not the first time MPD had used BLET-related processes against Plaintiff. In late 2025, Plaintiff appropriately failed a Mooresville-affiliated officer during an SFST certification course because that officer did not meet state practical standards. According to Plaintiff, an NC Justice Academy observer present commended Plaintiff's academic integrity, yet MPD officials nevertheless complained to the college and attempted to characterize Plaintiff's conduct as improper.

135.     Plaintiff was also informed, in substance, that institutional friction with Mooresville was affecting how Mitchell Community College approached Plaintiff's teaching assignments and interactions involving Mooresville-affiliated students or officers.

136.     The CJSD complaint placed Plaintiff's law-enforcement certification and instructor credentials at risk. According to the notice Plaintiff received, the allegations included "unprofessional personal conduct" and "lack of good moral character."

137.     Those allegations were selected for their breadth, subjectivity, and career-ending consequences. Upon information and belief, Defendants did not make equivalent complaints against other former MPD officers who later taught BLET or discussed prior employment-related experiences.

138.     The complaint against Plaintiff was uniquely motivated by his status as both a victim of retaliation and a witness to the circumstances of the February 24, 2025 operation.

139.     Separately, after Plaintiff's separation from MPD, MPD personnel or agents contacted Plaintiff regarding a departmental gas mask with a specific serial number and demanded its return or payment for it, while threatening criminal charges for larceny by employee if he failed to comply.

140.     Plaintiff did not possess the gas mask.

141.     Plaintiff immediately reported the threat to Statesville Police Department command. He was assured that the accusation appeared improper and that his employment would not be jeopardized by the threatened charge.

142.     No criminal charge was filed.

143.     Upon information and belief, the gas-mask accusation was baseless and was used as another means of intimidation and retaliation designed to deter Plaintiff from asserting legal rights against the Town and its officials.

## H. Pattern, Custom, and Broader Institutional Context

144.     The acts taken against Plaintiff were not isolated. They were consistent with a broader custom and practice within MPD and Town leadership of retaliating against employees who communicate information embarrassing to leadership, expose institutional irregularities, cooperate with outside agencies, or otherwise act in ways that draw scrutiny to MPD operations.

145.     During approximately the same broader period, MPD and Town leadership took materially adverse action against other employees or officials, including Assistant Chief Frank Falzone, IT Director Christopher Lee, and IT employee Jeffrey Noble, each of whom engaged in protected activity and was thereafter subjected to discipline, forced separation, retaliation, or hostile treatment involving substantially overlapping leadership personnel.

146.     The institutional response to the February 24, 2025 operation exemplifies this custom. Rather than discipline those responsible for planning, organizing, approving, or structuring an out-of-jurisdiction operation—upon information and belief including Detective Tuckler, Assistant Chief Quinn, and others in the command structure—the Town

protected the decision-makers and singled out Plaintiff, a support-role SRT medic, for punishment.

147. Upon information and belief, Plaintiff was the only SRT member disciplined as a result of the events described herein.

148. Defendant Jerome's personal participation in affirming the discipline without meaningful analysis, and in serving as the final decisionmaker over Plaintiff's personnel appeal, constituted ratification of the unconstitutional conduct alleged in this Complaint.

149. The Town is therefore liable not only because of the acts of its individual officials, but also because those acts were carried out pursuant to municipal customs, practices, failures to supervise or correct, and ratification by final policymakers.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment Retaliation
*(Against Defendants Campurciani, Faust, Goodale, and Jerome, in the individual capacities, and against the Town of Mooresville)*

150. Plaintiff realleges and incorporates by reference all preceding paragraphs.

151. The First Amendment, as applied to the States through the Fourteenth Amendment, prohibits government employers from retaliating against employees for engaging in protected speech. A public employee's speech is constitutionally protected where (1) the employee speaks as a citizen rather than pursuant to official duties, (2) the speech addresses a matter of public concern, and (3) the employee's interest in speaking outweighs any legitimate governmental interest in restricting the speech. See *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Lane v. Franks*, 573 U.S. 228 (2014).

152. Plaintiff spoke as a private citizen, not pursuant to any official duty. No MPD policy, order, protocol, or job description required or authorized Plaintiff—an SRT medic and traffic officer—to communicate operational information to Deputy Sharpe or to any external agency. Plaintiff had no responsibility for information control, intelligence

dissemination, or inter-agency coordination. The communication occurred on Plaintiff's personal Snapchat account, outside the chain of command, and was initiated by Deputy Sharpe—not Plaintiff—further confirming that Plaintiff was not acting within any official capacity or assigned function.

153.     Plaintiff's speech addressed matters of substantial public concern. Plaintiff communicated about a completed law-enforcement operation conducted by a municipal police department outside its territorial jurisdiction, without participation by the agency possessing primary jurisdiction, and under circumstances raising serious questions regarding jurisdictional authority, inter-agency accountability, and the lawful scope of police power. Speech exposing or discussing potential governmental overreach, jurisdictional irregularities, and inter-agency conduct lies at the core of First Amendment protection.

154.     Plaintiff's interest in speaking not only outweighed but eliminated any legitimate governmental interest in suppression under the circumstances. At the time of the communication:

   a.  the warrant had been fully executed;

   b.  the suspect was secured in custody;

   c.  Plaintiff's operational role had ended;

   d.  no instruction had ever been given that the operation was covert, classified, or subject to communication restrictions;

   e.  the existence and location of the operation had already become publicly visible through contemporaneous observation and public reporting of law-enforcement activity; and

   f.  the recipient was a sworn law-enforcement officer with full territorial authority in the jurisdiction where the operation occurred.

155. Under these facts, any asserted "operational security" interest was either nonexistent or pretextual and cannot, as a matter of law, outweigh Plaintiff's First Amendment rights.

156. Plaintiff's communication was limited, non-tactical, and non-sensitive. Plaintiff did not disclose confidential investigative methods, operational plans, or protected intelligence. Rather, Plaintiff responded to a fellow law-enforcement officer's inquiry after the operation had concluded, confirming general information that was already publicly observable, already known to the recipient, or inherently within the jurisdictional authority of that recipient's agency. Plaintiff further declined to communicate during the active phase of the operation, demonstrating adherence to legitimate operational discipline.

157. Defendants subjected Plaintiff to materially adverse actions that would deter a person of ordinary firmness from engaging in protected speech, including but not limited to: initiating an internal investigation; placing Plaintiff on administrative leave; reversing previously approved secondary employment authorization; engineering a policy-based violation to prohibit Plaintiff's EMS work; imposing suspension; transferring Plaintiff out of a specialized unit resulting in reduced compensation; creating and maintaining false and stigmatizing disciplinary records; imposing or maintaining an F-5-related stigma affecting Plaintiff's certification; submitting false or misleading post-employment complaints to Plaintiff's subsequent employer, teaching institution, and state certifying authority; and threatening baseless felony criminal prosecution.

158. Plaintiff's protected speech was a substantial or motivating factor in Defendants' actions. Retaliatory intent is demonstrated by, inter alia:

    a. the immediate temporal proximity between Plaintiff's communication and the initiation of discipline;

    b. Plaintiff's prior clean disciplinary record;

c. the disproportionate severity of the punishment relative to the alleged conduct;

d. the targeting of Plaintiff alone while similarly situated or more culpable participants were not disciplined; and

e. the escalation of retaliatory conduct after Plaintiff's separation, including efforts to damage Plaintiff's employment and professional certification.

159. Defendants' proffered justifications are false and pretextual. Specifically:

a. the operation was never designated as covert, classified, or restricted to Plaintiff;

b. no communication prohibition was ever conveyed to Plaintiff before, during, or after the operation;

c. Plaintiff declined to communicate during the operation and spoke only after its completion;

d. the information at issue was already publicly observable, publicly inferable, or independently known to the recipient;

e. the recipient was a sworn officer with territorial jurisdiction over the location of the operation; and

f. other participants—including those with direct planning or command responsibility—were not disciplined.

160. These contradictions establish that Defendants' asserted "operational security" rationale was manufactured after the fact to justify retaliatory action.

161. Defendants further engaged in a continuing course of retaliatory conduct after Plaintiff's separation from MPD, including submitting complaints to Plaintiff's subsequent employer, teaching institution, and state certifying authority, and threatening criminal prosecution. These actions were undertaken to punish Plaintiff for his prior protected

speech and to deter future speech, reporting, testimony, or legal action, and constitute an ongoing violation of Plaintiff's First Amendment rights.

162. Defendants Campurciani, Faust, Goodale, and Jerome personally participated in, directed, approved, or knowingly ratified the retaliatory conduct. Defendant Jerome, as the final decisionmaker, affirmed the discipline after being presented with specific factual disputes and constitutional objections and failed to meaningfully address them, thereby ratifying and adopting the unconstitutional conduct.

163. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer damages including lost wages, loss of specialty pay, loss of secondary employment income, damage to professional reputation and certification, emotional distress, and other economic and non-economic harm.

164. Defendants' conduct was willful, malicious, and undertaken in reckless disregard of Plaintiff's clearly established constitutional rights, entitling Plaintiff to compensatory and punitive damages against the individual Defendants.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Fourteenth Amendment
### Stigma-Plus Liberty Interest Deprivation / Denial of Name-Clearing Process
*(Against Defendants Campurciani, Goodale, and Jerome, in their individual capacities, and against the Town of Mooresville)*

165. Plaintiff realleges and incorporates by reference all preceding paragraphs.

166. The Fourteenth Amendment protects an individual's liberty interest in his good name, reputation, honor, and integrity. A governmental employer violates that liberty interest when it publicly disseminates false and stigmatizing statements in connection with a tangible alteration of employment status or other legal right or status ("stigma-plus"). In such circumstances, due process requires a constitutionally adequate opportunity for a name-

clearing hearing. See *Board of Regents v. Roth*, 408 U.S. 564 (1972); *Paul v. Davis*, 424 U.S. 693 (1976).

167.    Defendant Campurciani created, published, and caused to be maintained in Plaintiff's official disciplinary record a materially false and stigmatizing statement that Plaintiff "showed guilt" by deleting Snapchat messages, thereby implying that Plaintiff intentionally concealed evidence because he knew he had engaged in wrongdoing.

168.    That statement was false. Plaintiff never made any admission of guilt, never intentionally deleted evidence, and had no ability to preserve the messages at issue because the Snapchat platform automatically deletes communications by design. Defendant Campurciani's statement was therefore either knowingly false or made with reckless disregard for the truth.

169.    The stigmatizing statement was formally incorporated into Plaintiff's disciplinary record, transmitted through the chain of command, and placed in Plaintiff's personnel file, where it was available to and relied upon by decisionmakers, including Defendant Jerome. It was also inherently publishable to future law-enforcement employers and certifying authorities through standard employment verification and certification processes.

170.    Defendant Goodale separately made, caused to be made, or ratified materially false and stigmatizing statements to third parties outside MPD, including Statesville Police Department, Mitchell Community College, and the North Carolina Criminal Justice Education and Training Standards Commission. These statements falsely characterized Plaintiff as having engaged in unprofessional, inappropriate, or harassing conduct and were made for the purpose of impairing Plaintiff's employment, instructional opportunities, and professional certification.

171.     Defendants further caused or maintained an F-5-related separation notation that carried stigmatizing implications within the North Carolina law-enforcement certification system and required Plaintiff to submit explanatory materials to the Standards Division as a condition of continued or future certification. Such notation functions as a formal reputational flag to all future law-enforcement employers.

172.     Each of these stigmatizing statements was either disseminated to outside entities or placed into official disciplinary, personnel, separation, or certification channels under circumstances creating a likelihood that prospective law-enforcement employers, certifying bodies, and professional institutions would inspect or receive them.

173.     The stigmatizing statements were directly coupled with concrete adverse consequences, including but not limited to: Plaintiff's suspension; removal from the Traffic Enforcement Unit; loss of specialty pay; maintenance of a damaging disciplinary record; impairment of future employment opportunities; jeopardy to state law-enforcement certification; exposure to investigation by the Criminal Justice Standards Division; and damage to Plaintiff's standing within the law-enforcement and training community.

174.     Defendant Jerome, as final decisionmaker, reviewed and affirmed the disciplinary action after being expressly notified of the falsity of the inculpatory statement and the procedural defects in the process. By affirming the discipline without addressing or correcting the false statements, Defendant Jerome knowingly ratified and adopted the stigmatizing narrative as the official position of the Town.

175.     Plaintiff was not afforded a constitutionally adequate name-clearing opportunity. The internal review process did not provide a meaningful mechanism to confront and refute the false accusations, present evidence, or obtain a neutral determination. Defendant Jerome's final review consisted of a conclusory affirmance devoid of factual findings, credibility

determinations, or substantive engagement with Plaintiff's objections, rendering the process constitutionally deficient.

176. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer reputational harm, loss of employment opportunities, professional stigma within the law-enforcement community, emotional distress, and ongoing interference with his ability to pursue his chosen profession.

177. Plaintiff is entitled to compensatory damages, declaratory relief, expungement or correction of the false and stigmatizing records, a constitutionally adequate name-clearing hearing, and such further equitable relief as this Court deems appropriate.

### THIRD CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Fourteenth Amendment Due Process**
**Lack of Fair Notice, Arbitrary Enforcement, and Retroactive Policy Application**
(*Against Defendants Campurciani, Faust, and Goodale, in their individual capacities, and against Defendant Town of Mooresville*)

178. Plaintiff realleges and incorporates by reference all preceding paragraphs.

179. The Due Process Clause of the Fourteenth Amendment prohibits a governmental employer from disciplining an employee without fair notice of the conduct prohibited or from applying rules in an arbitrary, retroactive, or fundamentally unfair manner. Due process requires that an employee be able to ascertain, in advance, the rules governing his conduct and the consequences of noncompliance, and forbids the government from manufacturing violations through inconsistent or after-the-fact standards.

180. At all relevant times prior to February 27, 2025, MPD maintained a written secondary-employment policy that governed Plaintiff's approved off-duty EMS work. That policy:

    a. did not prohibit non-law-enforcement secondary employment while an officer was on administrative leave;

b. did not authorize suspension of previously approved secondary employment under the circumstances presented; and

c. contained no mechanism by which such employment could be revoked absent clearly defined triggering conditions.

181. Plaintiff had reviewed, acknowledged, and relied upon that policy in accepting and maintaining his secondary employment with Iredell County EMS. Plaintiff's reliance on the policy was reasonable, foreseeable, and consistent with MPD practice.

182. Immediately following Plaintiff's placement on administrative leave, Sergeant Dingler reviewed the operative policy and determined that it did not prohibit Plaintiff from working his EMS shift. Defendant Goodale was consulted and initially concurred in that interpretation. Plaintiff was expressly advised that he was permitted to work outside of law enforcement, and he relied on that authorization.

183. Only hours later, and less than twelve hours before Plaintiff's scheduled EMS shift, command staff—including Defendants Faust and Campurciani—reversed that interpretation without identifying any policy provision that prohibited the work. The resulting directive was abrupt, inconsistent with the written policy, and communicated under circumstances that created confusion and made compliance impracticable.

184. Plaintiff's supervisor further communicated that Plaintiff should "do what [he] needed to do," reinforcing the absence of a clear, lawful, and unambiguous order prohibiting the work. Under these circumstances, Plaintiff reasonably relied on both the written policy and supervisory guidance in proceeding with his previously scheduled EMS shift.

185. Plaintiff's conduct on February 27, 2025 therefore occurred:

a. under a written policy that did not prohibit the conduct;

b. after policy-based review by two supervisors confirming that it was permitted; and

c. in the absence of any clear, lawful, and consistently communicated directive to the contrary.

186. On February 28, 2025—the day after Plaintiff worked his EMS shift—MPD issued or implemented a materially revised secondary-employment policy that, upon information and belief, for the first time expressly authorized suspension of approved secondary employment during administrative leave.

187. Plaintiff did not receive, review, or acknowledge that revised policy prior to the conduct at issue and had no access to it at the time Defendants later relied upon it.

188. Defendants nevertheless invoked the newly created or clarified prohibition—either expressly or functionally—to justify discipline for Plaintiff's prior conduct. In doing so, Defendants applied a standard that did not exist, was not communicated, and was not reasonably ascertainable at the time Plaintiff acted.

189. Defendants' actions constituted arbitrary and fundamentally unfair enforcement, including:

a. issuing inconsistent and contradictory directives within a matter of hours;

b. overriding a policy-based interpretation by supervisory personnel without identifying any governing rule;

c. imposing an alleged obligation that Plaintiff could not reasonably ascertain or comply with; and

d. retroactively relying on a subsequently issued or clarified policy to justify discipline.

190. This conduct deprived Plaintiff of fair notice and violated basic principles of due process. A reasonable employee in Plaintiff's position could not have known that his conduct was prohibited, particularly after receiving policy-based approval and inconsistent supervisory guidance.

191. Defendants' actions were not the result of a neutral application of policy but instead reflected arbitrary enforcement and deliberate indifference to Plaintiff's constitutional rights.

192. As a direct and proximate result of these due process violations, Plaintiff suffered discipline, loss of wages, loss of specialty pay, loss of secondary employment income, reputational harm, and other damages.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Municipal Liability under *Monell***
(*Against Defendant Town of Mooresville*)

193. Plaintiff realleges and incorporates by reference all preceding paragraphs.

194. At all relevant times, Defendant Town of Mooresville, acting through its Police Department, Town Manager, Chief of Police, and other supervisory and delegated officials, was responsible for the policies, practices, customs, training, supervision, disciplinary processes, recordkeeping practices, and appeal procedures that governed Plaintiff's employment and the conduct at issue in this action.

195. The constitutional violations suffered by Plaintiff were proximately caused by the Town's official policies, longstanding customs or practices, deliberate indifference in training and supervision, and ratification by final policymakers.

196. The Town, through MPD and Town leadership, maintained and tolerated customs and practices of retaliating against employees who engaged in protected speech, communicated information embarrassing or institutionally damaging to command staff, cooperated with outside agencies, questioned jurisdictional or operational irregularities, or otherwise engaged in conduct that exposed Town leadership or MPD command to scrutiny.

197. The Town further maintained and tolerated customs and practices of using vague disciplinary standards, including "conduct unbecoming" and similarly elastic provisions, as pretextual mechanisms for punishing protected activity, manufacturing disciplinary violations

through shifting or contradictory directives, and preserving false or stigmatizing narratives in official personnel records in order to justify adverse action.

198. The Town also maintained and tolerated customs and practices of extending retaliation beyond the end of employment by interfering with former employees' future work, certifications, professional standing, and instructional opportunities through stigmatizing records, external complaints, and other adverse reporting to third parties.

199. In addition, the Town failed to adequately train and supervise supervisory and policymaking personnel concerning:

a. the constitutional limits on disciplining public employees for protected speech;

b. the distinction between speech made pursuant to official duties and speech made as a citizen on matters of public concern;

c. the requirement that employees receive fair notice before discipline is imposed;

d. the prohibition against retroactive or arbitrary policy enforcement;

e. the constitutional limits on maintaining and disseminating false and stigmatizing personnel records; and

f. the prohibition against retaliatory interference with post-employment opportunities and state certification processes.

200. The need for such training and supervision was obvious. MPD supervisors and Town leadership were making disciplinary and recordkeeping decisions that foreseeably implicated core First Amendment rights, due-process rights, professional certification consequences, and future law-enforcement employment. Despite that obvious need, the Town failed to implement constitutionally adequate safeguards, training, supervision, or review.

201. The Town's failure to train and supervise amounted to deliberate indifference to the known or obvious consequence that employees such as Plaintiff would be subjected to unconstitutional retaliation, arbitrary discipline, stigmatizing falsehoods, and career-damaging post-employment interference.

202. The Town is also liable because final policymakers personally directed, approved, or ratified the challenged conduct. Defendant Campurciani exercised final or effectively final authority over Plaintiff's discipline, adopted the rationale for the charges against Plaintiff, and caused materially false and stigmatizing assertions to be placed into the official disciplinary record.

203. Defendant Jerome, acting as Town Manager and final administrative decisionmaker over Plaintiff's appeal, received detailed written notice of Plaintiff's factual objections, constitutional objections, lack-of-notice arguments, retroactive-policy objections, and challenge to the false inculpatory statement in the record. Notwithstanding that notice, Jerome affirmed the discipline in a conclusory manner without factual findings, without constitutional analysis, and without correcting the false and stigmatizing record.

204. Jerome's affirmance and Campurciani's disciplinary decision were not merely ministerial acts. They constituted official Town action and policymaker ratification of the retaliatory discipline, the arbitrary and retroactive policy application, and the maintenance of false and stigmatizing records.

205. The Town is further liable because the unconstitutional treatment inflicted on Plaintiff was consistent with a broader pattern of materially similar retaliatory conduct by MPD and Town leadership toward other employees who engaged in protected activity or exposed institutional irregularities, including retaliation through selective discipline, forced separation, hostile employment action, and post hoc justification by Town management.

206. The policies, customs, practices, failures to train and supervise, and policymaker ratification described above were the moving force behind the violations of Plaintiff's rights under the First and Fourteenth Amendments.

207. As a direct and proximate result of the Town's municipal policies, customs, practices, deliberate indifference, and ratification, Plaintiff suffered the constitutional injuries and damages alleged herein, including loss of income, loss of specialty pay, loss of secondary-employment income, reputational harm, certification jeopardy, emotional distress, and continuing professional injury.

**FIFTH CLAIM FOR RELIEF**
**North Carolina Constitution – Article I, Sections 14 and 19**
**Freedom of Speech and Law of the Land**
*(Against Defendant Town of Mooresville)*

208. Plaintiff realleges and incorporates by reference all preceding paragraphs.

209. Article I, Section 14 of the North Carolina Constitution guarantees freedom of speech. Article I, Section 19 guarantees that no person shall be deprived of liberty or property except by the law of the land and prohibits arbitrary, capricious, and fundamentally unfair governmental action.

210. Plaintiff engaged in speech on matters of substantial public importance protected by Article I, Section 14, including speech concerning the legality, jurisdictional basis, inter-agency propriety, and accountability implications of a law-enforcement operation conducted outside the Town's territorial authority and without participation from the agency possessing primary jurisdiction.

211. Acting under color of law and on behalf of the Town, Defendants retaliated against Plaintiff for that protected speech by initiating discipline, imposing suspension and transfer, reducing his compensation, creating and maintaining false and stigmatizing records, and

extending retaliation beyond Plaintiff's employment through complaints designed to impair his certification, instructional work, and professional standing.

212. The Town, through its officers, supervisors, and final decisionmakers, also acted arbitrarily and contrary to the law of the land by, among other things:

a. punishing Plaintiff for speech that had never been identified as prohibited, restricted, confidential, or classified;

b. imposing discipline without fair notice that the challenged communication was forbidden;

c. retroactively invoking or relying upon a newly created or materially expanded secondary-employment restriction to justify discipline for prior conduct;

d. imposing discipline based on conduct occurring outside Plaintiff's law-enforcement role, including lawful, previously approved non-law-enforcement employment;

e. inserting, adopting, and maintaining materially false and inculpatory assertions in Plaintiff's official disciplinary record; and

f. affirming the discipline through a conclusory and structurally deficient review process that failed to meaningfully address Plaintiff's factual record, policy-based defenses, and constitutional objections.

213. In particular, the Town's actions were arbitrary and constitutionally infirm because Plaintiff's secondary employment at issue was not law enforcement activity, but rather civilian paramedic work for Iredell County EMS—work that did not involve police authority, investigative functions, or exercise of governmental power on behalf of MPD. The Town nevertheless treated that non-law-enforcement employment as if it were subject to undefined, retroactively imposed restrictions and used it as a basis for discipline.

214.   The Town's conduct, taken as a whole, lacked fair notice, departed from established policy and practice, relied on after-the-fact justifications, and imposed punishment untethered to any legitimate, preexisting governmental standard, rendering it arbitrary, capricious, and inconsistent with Article I, Sections 14 and 19.

215.   Plaintiff asserts this claim directly under the North Carolina Constitution because no adequate state-law remedy provides complete relief for the specific state constitutional injuries alleged herein, including retaliation for protected speech, arbitrary law-of-the-land violations, and the ongoing reputational and certification-related harms caused by official action.

216.   As a direct and proximate result of these constitutional violations, Plaintiff has suffered loss of income, reputational injury, impairment of professional opportunities, emotional distress, and other economic and non-economic damages, and is entitled to declaratory, equitable, and such further relief as the Court deems proper.

## SIXTH CLAIM FOR RELIEF
### North Carolina Constitution – Article I, Section 1
### Right to the Fruits of One's Labor
(*Against Defendant Town of Mooresville*)

217.   Plaintiff realleges and incorporates by reference all preceding paragraphs.

218.   Article I, Section 1 of the North Carolina Constitution protects the right of a citizen to enjoy the fruits of his own labor and to pursue lawful gainful employment free from arbitrary and unreasonable governmental interference.

219.   At all relevant times, Plaintiff held approved secondary employment with Iredell County EMS under MPD's then-existing written policy. That employment was lawful, non-conflicting, previously vetted and approved by MPD, and constituted a significant and legitimate source of earned income.

220.     Plaintiff's EMS work was purely non-law-enforcement in nature. In that role, Plaintiff functioned as a civilian paramedic providing medical care and emergency response services. He did not exercise police powers, perform investigative duties, act under MPD authority, or engage in any activity implicating MPD's law-enforcement mission.

221.     Plaintiff and his EMS employer reasonably relied on MPD's approval of this secondary employment in scheduling shifts, staffing emergency-response coverage, and coordinating work obligations essential to public safety.

222.     The Town arbitrarily and unjustifiably interfered with Plaintiff's right to the fruits of his labor by, among other things:

   a.   abruptly revoking or purporting to revoke Plaintiff's approved EMS work on less than twelve hours' notice;

   b.   reversing a policy-based authorization after supervisory personnel had reviewed the governing policy and confirmed that Plaintiff's EMS work was permissible;

   c.   imposing a restriction untethered to any existing written policy and later attempting to justify it through retroactive policy changes;

   d.   creating an impossible compliance scenario in which Plaintiff was simultaneously authorized and prohibited from working, and then using that manufactured conflict as a basis for discipline;

   e.   treating Plaintiff's non-law-enforcement paramedic work as if it were subject to undefined law-enforcement restrictions; and

   f.   removing Plaintiff from the Traffic Enforcement Unit and depriving him of the associated specialty-pay differential.

223.     The Town's interference with Plaintiff's employment and earnings was arbitrary, lacked fair notice, was inconsistent with its own policies and prior approvals, and was not

reasonably related to any legitimate governmental objective—particularly given that Plaintiff's EMS work was unrelated to law enforcement and posed no operational conflict.

224. As a direct and proximate result of this unconstitutional interference, Plaintiff suffered loss of EMS income, loss of specialty pay, diminished earning capacity, and additional economic and professional harm.

225. Plaintiff is therefore entitled to declaratory, equitable, and monetary relief to the extent permitted under North Carolina law.

## PUNITIVE DAMAGES ALLEGATIONS

226. Plaintiff realleges and incorporates by reference all preceding paragraphs.

227. The conduct of the individual Defendants was malicious, willful, wanton, oppressive, and undertaken with reckless or callous indifference to Plaintiff's clearly established constitutional and other protected rights.

228. Among other things, the individual Defendants knowingly or recklessly engaged in conduct including:

   a. treating protected speech as disciplinable misconduct under a theory not previously communicated to Plaintiff;

   b. fabricating, adopting, or ratifying inculpatory assertions unsupported by fact, including the false claim that Plaintiff demonstrated consciousness of guilt by "deleting" messages;

   c. creating, maintaining, approving, or failing to correct false and stigmatizing material in Plaintiff's disciplinary and employment records;

   d. engineering a secondary-employment trap through contradictory directives, abrupt reversal of policy-based authorization, and after-the-fact justification;

Case 5:26-cv-00076    Document 1    Filed 03/30/26    Page 42 of 46

e.  relying upon or invoking retroactive policy changes to support discipline for conduct that occurred before the policy existed or before Plaintiff had notice of it;

f.  extending retaliation beyond Plaintiff's employment through complaints or reports directed to Plaintiff's later employer, teaching institution, and state certifying authority;

g.  attempting to impair Plaintiff's law-enforcement certification, instructional credentials, and future employability through knowingly false or misleading complaints; and

h.  threatening baseless criminal prosecution in order to intimidate Plaintiff and deter him from pursuing complaints, testimony, or legal relief.

229.    The foregoing conduct was not the result of negligence, mistake, or mere bureaucratic misunderstanding. It reflected deliberate retaliation, bad faith, conscious disregard of Plaintiff's rights, and a knowing willingness to use official authority and official records to punish Plaintiff and damage his livelihood.

230.    Plaintiff is therefore entitled to recover punitive damages against the individual Defendants, in their individual capacities, in an amount to be determined at trial, on those claims for which punitive damages are authorized by law.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and grant the following relief:

1.  Declare that Defendants' acts and omissions violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution;

2.  Award compensatory damages in an amount to be determined by the jury for lost income, lost earning capacity, reputational harm, emotional distress, and other non-economic damages;

3. Award nominal damages for the violation of Plaintiff's constitutional rights;

4. Award punitive damages against the individual Defendants in their individual capacities, as permitted by law, for their willful, malicious, and reckless conduct;

5. Order equitable relief requiring the correction, expungement, or removal of false, stigmatizing, and retaliatory material from Plaintiff's personnel file and related administrative records;

6. Order appropriate relief concerning Plaintiff's law enforcement certification records, including correction or expungement of any false or retaliatory F-5-related entries, to the extent permitted by law;

7. Order a constitutionally adequate name-clearing hearing to remedy the stigma imposed on Plaintiff in connection with his separation;

8. Award back pay, lost specialty pay, lost secondary income, front pay or reinstatement (as appropriate), and all other economic damages resulting from Defendants' conduct;

9. Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law;

10. Grant pre-judgment and post-judgment interest as allowed by law; and

11. Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiff Paul Alexander Exon hereby demands a trial by jury on all issues so triable in this action, including but not limited to liability, compensatory damages, punitive damages, and entitlement to declaratory and equitable relief.

Dated: March 30, 2026

/s C. Christopher Adkins

C. Christopher Adkins
N.C. Bar No. 46950

Adkins Law, PLLC
9620 Sherrill Estates Road
Huntersville, North Carolina 28078
Phone: (704) 274-5677
Fax: (877) 208-7577
chris@huntersvillelawyer.com

/s Christerfer R. Purkey
N.C. Bar No. 53584
Rech Law, P.C.
18125 W. Catawba Avenue
Cornelius, North Carolina 28031
(704) 228-2790 phone
(704) 909-7410 fax
cpurkey@rechlaw.com
*Admission in W.D.N.C. pending

*Counsel for Plaintiff*

*** Verification Page to Follow ***

# VERIFICATION

I, **Paul Alexander Exon**, being duly sworn, state that I have read the foregoing Complaint and know the contents thereof; that the factual allegations stated therein are true and correct to the best of my knowledge, information, and belief; and that the matters stated upon information and belief are believed by me to be true.

This **26** day of March, 2026.

_Paul Alexander Exon_
**Paul Alexander Exon**

STATE OF NORTH CAROLINA
COUNTY OF __Iredell__

Subscribed and sworn to (or affirmed) before me this **26** day of March, 2026, by **Paul Alexander Exon**, who is personally known to me or has produced ___NCDL___ as identification.

Notary Public Name: **Mirian Marisol Argueta**

Notary Public Signature: _Mirian Marisol argueta_

My Commission Expires: ___01-26-2030___

[Notary Seal]

